CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

9/6/2017

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| LISA PHILLIPS,<br><br>*Plaintiff,*<br><br>v.<br><br>TRANS UNION, LLC, *ET AL.*,<br><br>*Defendants.* | CASE NO. 3:16-CV-00088<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This case, brought by Plaintiff Lisa Phillips ("Phillips"), concerns information that Defendant Specialized Loan Servicing, LLC ("SLS") provided to credit reporting agencies, like Defendant Trans Union, LLC ("Trans Union"), and that these agencies publish in credit reports. Phillips now seeks summary judgment against SLS on Counts I and II of the Complaint. (Dkt. 30). Count I alleges a negligent violation of the Fair Credit Reporting Act ("FCRA"), and Count II alleges a willful violation of the FCRA. The two counts allege that SLS provided inaccurate or incomplete information about Phillips to Trans Union. SLS opposes summary judgment, arguing that Phillips lacks Article III standing and ignores evidence that validates the information it furnished. (Dkt. 35 at 4-5).

As explained below, Phillips has standing under *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), both because her alleged injury is analogous to common law causes of action (like defamation and libel) and because she allegedly has suffered the type of harm Congress sought to prevent by enacting the FCRA. On the merits, this Court will deny Phillips' motion as to the negligent violation of the FCRA because there is a genuine dispute of material fact over whether SLS's investigation into any inaccuracies was reasonable. This Court will also deny Phillips' motion as to the allegedly willful violation of the FCRA because a reasonable jury need not find that any of the alleged violations were willful.

1

# I. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In order to preclude summary judgment, the dispute about that material fact must be "genuine." *Id.* A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

# II. FACTS

Lisa Phillips owned a home in Las Vegas, Nevada. (Dkt. 30-1 at 3). In November 2006, Phillips obtained a second mortgage on that home for $77,764.80. (Dkt. 30-2 at 1). The original servicer of this second mortgage transferred it to SLS for servicing on August 5, 2009. (Dkt. 30-3 at 2). Phillips then defaulted on this loan. (Dkt. 30-8). She made her last payment on August 26, 2009, the same month that the loan was transferred to SLS. (Dkts. 30-5, 30-6, 30-7). Approximately three months later SLS "charged-off" the loan. (Dkt. 30-4 at 7).[1] SLS sold the home in a short sale in January 2011. (Dkt. 30-9). SLS and Phillips negotiated a settlement

---

[1] "The term[ ] . . . 'charge-off' describe[s] a debt that is deemed uncollectible and written off." *Saunders v. Branch Banking And Tr. Co. Va.*, 526 F.3d 142, 146 n.2 (4th Cir. 2008).

agreement for the outstanding balance of the loan in May 2011, and Phillips paid $4,000 to settle her outstanding debt on June 27, 2011. (Dkts. 35-1, 35-2). At this point, SLS confirmed that Phillips no longer owed it any money. (Dkts. 30-4 at 23, 30-3 at 1).

In the following years, Phillips disagreed with how credit reporting agencies were displaying this now-settled debt on her credit report. She sent Trans Union three letters in 2016 expressing her concerns. (Dkts. 30-10, 30-14, 30-16). Phillips disputed when she had first fallen behind on the loan—specifically she contended that her first delinquency was in September 2009, but that the credit reports wrongly reported that it was in June 2011. (*Id.*). Trans Union, in turn, contacted SLS to verify the information that Phillips disputed using Automated Consumer Dispute Verification ("ACDV") forms. (Dkts. 30-5, 30-6, 30-7, 30-11 at 68). These forms are part of the industry standard format for credit reporting developed by the Consumer Data Industry Association ("CDIA"). (Dkt. 30-11 at 15). There is "an industry-wide automated consumer dispute resolution system," called e-OSCAR, that allows furnishers and credit reporting agencies the ability to verify consumer disputes using these ACDV forms. (*Id.* at 17).

SLS responded, also using these forms, that it was reporting the disputed information correctly, contrary to Phillips' protestations. (Dkts. 30-5, 30-6, 30-7). Trans Union communicated at least two of SLS's responses back to Phillips. (Dkts. 30-15, 30-16). Unsatisfied, Phillips filed this lawsuit. (Dkt. 1).

### III. DISCUSSION

#### A.    Phillips has Article III standing.

SLS suggests that Phillips lacks Article III standing. (Dkt. 35 at 6). In particular, SLS notes that Phillips has not put forward evidence specifying what monetary or emotional distress damages she has incurred. (*Id.* at 7). SLS has not formally brought a motion to dismiss or a cross-motion for summary judgment based on a lack of standing, but if jurisdiction "ceases to

exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Accordingly, a discussion of standing and the Court's jurisdiction follows.

"Standing 'is a threshold jurisdictional question' that ensures a suit is 'appropriate for the exercise of the [federal] courts' judicial powers.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)) (alteration in *Dreher*). To have standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An injury in fact must be both "concrete" and "particularized." *Id.* "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)). And "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

Concerns about the concreteness of injuries arising from statutory violations are heightened in the FCRA context. Last year, in *Spokeo*, the Supreme Court observed that "[a] violation of one of the FCRA's procedural requirements may result in no harm" and so a mere procedural violation of the FCRA that produces no "concrete and particular" injury will not be justiciable. *Id.* at 1548, 1550. However, the Supreme Court reiterated that "intangible injuries can nevertheless be concrete," *id.* at 1549 (citing injuries to free speech and free exercise rights), and has provided two tests to guide the concreteness analysis. *Id.*; *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 637 (3d Cir. 2017) ("There are thus two tests for whether an intangible injury can (despite the obvious linguistic contradiction) be 'concrete.'").

First, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. If the "alleged intangible harm" does have a close relationship to a traditionally recognized harm, "it is likely to be sufficient to satisfy the injury-in-fact element of standing." *In re Horizon*, 846 F.3d at 637. This analogy to the past makes sense "[b]ecause the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice." *Spokeo*, 136 S. Ct. at 1549.

If the "alleged intangible harm" does not have a close relationship to a traditionally recognized harm, we move to the second test. This inquiry asks whether, even in the absence of a traditional harm, Congress has sought to "identify[] and elevat[e] [this] intangible harm[]" and make it redressable. *Spokeo*, 136 S. Ct. at 1549 ("[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."). Of course, Congress cannot outflank Article III's requirements. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 344 (4th Cir. 2017) ("[A] plaintiff cannot automatically satisfy the injury in fact requirement just because 'a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"). But Congress may, and frequently does, "accord[] a procedural right to protect [a plaintiff's] concrete interests." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The recipient of such a procedural right can "assert that right without meeting all the normal standards for redressability and immediacy." *Id.*; *see also Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016) ("[W]here Congress confers a procedural right

in order to protect a concrete interest, a violation of the procedure may demonstrate a sufficient 'risk of real harm' to the underlying interest to establish concrete injury without 'need [to] allege any additional harm beyond the one Congress has identified.'" (quoting *Spokeo*, 136 S.Ct. at 1549)).

Earlier this year, the Fourth Circuit engaged in *Spokeo*'s two-part analysis. *Dreher*, 856 F.3d at 337. In *Dreher*, the defendant "list[ed] a defunct credit card company, rather than the name of its servicer, as a 'source[ ] of . . . information' on an individual's credit report." *Id.* at 340 (second alteration in original). "Dreher claim[ed] he suffered a cognizable 'informational injury' because he was denied 'specific information to which [he] w[as] entitled under the FCRA'"—namely the contact information for the servicer he was interacting with. *Id.* at 345. But the court could "find no traditional right of action that is comparable." *Id.* It quickly moved on to the second leg of the inquiry: whether the procedural right protected "the type of harm Congress sought to prevent." *Id.* at 347 (citation omitted). "In enacting the FCRA, Congress sought 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). But "Dreher . . . failed to show how the knowledge that he was corresponding with [the servicer's] employee, rather than [the defunct credit card's] employee, would have made any difference at all in the 'fair[ness] or accura[cy]' of his credit report, or that it would have made the credit resolution process more efficient." *Id.* at 346 (third and fourth alterations in the original). The alleged procedural violation did not correspond to a traditional right of action or the concrete interests that Congress sought to protect, so Dreher did not have standing. *Id.* at 340.

As for Phillips, her injury consists of SLS's allegedly inaccurate reporting of her credit information to the credit reporting agencies. (Dkts. 30-5, 30-6, 30-7). More specifically, SLS

allegedly reported the wrong date of Phillips' first delinquency. (*Id.*). This date matters both because it informs potential creditors how long ago this delinquency occurred and because credit reporting agencies use it to determine how long her delinquent loan should remain on credit reports. *See* 15 U.S.C. § 1681c(c)(1). Importantly, this allegedly inaccurate information was about Phillips herself, and not, as in *Dreher*, about a third party. If SLS did furnish inaccurate information, it would be contributing to a material false disclosure about Phillips' credit history.

This injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. Compare it to *Spokeo*. There, the plaintiff alleged that the defendant "falsely reported that he is married with children, that he is in his 50s, that he is employed in a professional or technical field, that he has a graduate degree, and that his wealth level is higher than it is." *Robins v. Spokeo, Inc.*, No. 11-56843, 2017 WL 3480695, at *7 (9th Cir. Aug. 15, 2017)). On remand, the Ninth Circuit analogized the injuries in that case to common law protections against defamation and libel, even though none of the inaccurate information was obviously negative. *Id.* at *5.[2] At common law, "libel was 'actionable per se . . .' because the 'publication is itself an injury.'" *Id.* (quoting the Restatement (First) of Torts § 570 (1938)).

The injury here also deals with falsely reported information about the plaintiff, namely the date of Phillips' first delinquency on the loan. Like the injury in *Spokeo*, this publication of false information is analogous to libel. Because "[c]ourts have long entertained causes of action to vindicate intangible harms caused by certain untruthful disclosures about individuals," *Robins*, 2017 WL 3480695 at *7, this injury "is likely to be sufficient to satisfy the injury-in-fact element of standing." *In re Horizon*, 846 F.3d at 637.

Even if Phillips' injury did not have a sufficiently "close relationship to a harm that has

---

[2]     The plaintiff alleged that obviously false information, even if not obviously negative, would undermine his credibility. *Id.*

traditionally been regarded as providing a basis for a lawsuit in English or American courts," *Spokeo*, 136 S. Ct. at 1549, the harm is still concrete under *Spokeo* because it is "the type of harm [that] Congress sought to prevent by requiring disclosure." *Dreher*, 856 F.3d at 347. Phillips' injury falls squarely within the interests that Congress sought to protect by enacting the FCRA; it deals directly with the accuracy of the credit information reported about her. It is more like the injury in *Spokeo* than the injury in *Dreher*. In *Spokeo* the plaintiff alleged that the defendant falsely reported various biographical details about *him*. 2017 WL 3480695 at *7. This violation of the FCRA's accuracy requirement led to a concrete injury because "[e]nsuring the accuracy of this sort of information thus seems directly and substantially related to [the] FCRA's goals." *Id.* at *5. Likewise, Phillips' injury is sufficiently concrete because "ensuring the accuracy of [the information inaccurately reported by SLS] seems directly and substantially related to [the] FCRA's goals." The inaccuracy in *Dreher*, on the other hand, dealt with a fact about the *creditor*, and accordingly did not implicate Congress's attempt to protect *consumers*. *Dreher*, 856 F.3d at 340.

Finally, as in *Spokeo* itself, the particularization of Phillips' injury is not disputed here. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Here, Phillips' injury is specific to her personal credit report. (Dkts. 30-5, 30-6, 30-7). This is not an "undifferentiated" general harm that would raise questions about particularity. *United States v. Richardson*, 418 U.S. 166, 177 (1974). Phillips' injury is sufficiently particularized to support standing.

In summary, Phillips has sufficiently established that she has standing to bring this suit, and the Court is convinced of its jurisdiction.

### B. Phillips' FCRA Claims

"The FCRA seeks to ensure 'fair and accurate credit reporting.'" *Spokeo*, 136 S. Ct. at

1545 (quoting 15 U.S.C. § 1681(a)(1)).  It does this by regulating "the creation and the use of 'consumer report[s]' by 'consumer reporting agenc[ies]' for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment."  *Id.* (footnotes omitted).  The FCRA does not only burden consumer reporting agencies; it also creates duties for the creditors that furnish information to consumer reporting agencies, known as "furnishers."  *See* 15 U.S.C. § 1681s-2; *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 429 (4th Cir. 2004).  This is necessary to ensure the accuracy of the reports eventually published by the consumer reporting agencies.  Some of the duties imposed on furnishers may be enforced only by certain agencies and officials.  *See id.* at § 1681s-2(c), (d).  Other duties, like those at issue here, may be enforced directly by harmed consumers.  *See id.* at § 1681s-2(b), (c).  Generally, the FCRA provides civil liability for both negligent and willful noncompliance with the Act's obligations.  *See id.* at §§ 1681n, o.  Phillips has alleged both negligent and willful violations of SLS's furnisher obligations.

### i.    Count 1: Negligent Violation of the FCRA by SLS

Section 1681o provides that "[a]ny person who is negligent in failing to comply with" the FCRA is liable to consumers for damages, costs, and reasonable attorney's fees.  The FCRA provides that when a furnisher of information receives notice of a dispute from a consumer reporting agency it shall:

(A) conduct an investigation with respect to the disputed information;
(B) review all relevant information provided by the [agency] . . .;
(C) report the results of the investigation to the [agency];
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [agencies] . . .; and
(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation . . . (i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).  SLS is then liable to Phillips under Section 1681o if it negligently

violated these duties.

The Fourth Circuit elaborated on what duties a furnisher owes a consumer. In particular, it has held that the "investigation" requirement on a furnisher demands only a "reasonable" investigation. *See Johnson*, 357 F.3d at 431. This cuts for and against furnishers. The inaccuracy of furnished information, without evidence that the furnisher's investigation was unreasonable, does not create liability by itself. *Id.*; *Blick v. Wells Fargo Bank, N.A.*, No. 3:11-CV-00081, 2012 WL 1030137, at *9 (W.D. Va. Mar. 27, 2012), *aff'd*, 474 F. App'x 932 (4th Cir. 2012). However, instigating an unreasonable investigation that does not reveal the inaccuracy will not insulate a furnisher from liability. *Johnson*, 357 F.3d at 431.

Unsurprisingly, a reasonableness determination should look to many different factors. The analysis involves the weighing of "the cost of verifying the accuracy of the information" against "the possible harm of reporting inaccurate information." *See Johnson*, 357 F.3d at 432. Relatedly, it should also be "based on an evaluation of information within the furnisher's possession, such as correspondence between the consumer and the furnisher, the data identified by the reporting agency as disputed, and the furnisher's other records relating to the disputed account." *David M. Daugherty v. Ocwen Loan Servicing, LLC*, No. 16-2243, 2017 WL 3172422, at *4 (4th Cir. July 26, 2017) (unpublished); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) ("[H]ow thorough an investigation must be to be 'reasonable' turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.").

Reasonableness determinations are normally left to the jury, and the Fourth Circuit has reiterated this rule in the FCRA context. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 416 (4th Cir. 2001) ("The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.'" (citation omitted)). Still, this does not necessarily preclude summary judgment. "It is appropriate 'when only one conclusion

about the conduct's reasonableness is possible.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (citation omitted).

Here, however, summary judgment is inappropriate. To repeat, even if SLS furnished inaccurate information, it would not incur liability unless its investigation into the disputed information was "unreasonable." *See Johnson*, 357 F.3d at 431. Phillips has not met the high burden of proving that, after making all reasonable inferences in SLS's favor, "no genuine dispute as to" SLS's reasonableness remains. *Anderson*, 477 U.S. at 248. First, SLS describes its investigation as follows: "In response to each [dispute form], SLS's [dispute] operator reviewed the form, checked SLS's records regarding the disputed information, and responded accordingly." *Id.* And again: "operators review the substance of the dispute, check SLS's internal records regarding the alleged reporting error, and respond accordingly." *Id.* This description of the investigation is admittedly short, but it describes a process that jury could find reasonable. *Boggio*, 696 F.3d at 617 ("[F]irst and foremost a furnisher must review all relevant information provided to it by a CRA regarding a dispute in order to comply with § 1681s–2(b)(1)(B)."). Furthermore, Phillips has introduced *no* evidence describing SLS's investigation or demonstrating what about it was particularly unreasonable. SLS's description of its investigation is sufficient to create a "genuine" dispute about a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Second, many of the inaccuracies alleged by Phillips are centered on how to properly interpret the CDIA Guide.[3] Phillips contends that SLS wrongly reported that "the Loan was 90-119 days past due in May of 2011," that the Account History was incomplete because it

---

[3]    As discussed above, the Consumer Data Industry Association ("CDIA") has created the form that credit reporting agencies and creditors use to communicate. The CDIA also publishes a guide explaining how to use the form and what the various fields indicate. (Dkt. 30-11).

indicates that SLS did not have payment information for months when its service log indicated that it did, and that SLS reported an inaccurate date of first delinquency. (Dkt. 30 at 10-14). With respect to at least the first two of these alleged mistakes, any mistake likely inured to Phillips' *benefit*. SLS introduced evidence that Phillips and SLS settled the outstanding loan in June 2011 for $4,000, (dkts. 35-1, 35-2), and further argues that this settlement payment justified the information that it reported to Trans Union. (Dkt. 35 at 5). Until she settled her loan at the end of June 2011, Phillips still was past due on her obligations to SLS—just by *more* than the 90 to 119 days reported by SLS. And if SLS had reported the allegedly incomplete information, it would have only shown that she was behind—not the neutral lack of information reported.

With respect to the third alleged mistake, SLS introduced evidence that "[t]he CDIA Guide . . . is silent on how dates of first delinquency are to be reported for cases in which the account is paid in full for less [than] the full balance." (Dkt. 35 at 5 (citing Dkt. 30-11 at 188)). The Court is not necessarily convinced by this characterization of the CDIA Guide, (*cf.* dkt. 30-11 at 68 (describing how the date of first delinquency should generally be reported)), but Phillips did not respond to SLS's characterization and conversely relies on a statutory definition that appears to provide guidance to *credit reporting agencies* but not necessarily *furnishers*. (*See* Dkt. 30 at 10 (citing 15 U.S.C. § 1681c(c)(1))). At the very least, "the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (U.S. 1999).[4]

Third, as described the above, a reasonableness determination must consider multiple factors, including the documents in the furnisher's possession, the communications between the

---

[4]    This is not to say that a furnisher is required to consult and adhere to every nuance of the CDIA Resource Guide. *Cf. Jones v. Experian Info. Sols., Inc.*, No. 1:11-CV-826, 2012 WL 2905089, at *5 (E.D. Va. July 16, 2012) ("The simple failure to consult an external source in the investigation of post-plan confirmation credit reporting simply cannot constitute an unreasonable investigation per se within the meaning of § 1681s2–(b)(1)(A).").

credit reporting agency and the furnisher, and the cost of discovering the inaccuracy.  *Johnson*, 357 F.3d at 432; *Daugherty*, 2017 WL 3172422 at *4.  The information in SLS's possession does not lead obviously to one conclusion.  Phillips notes that the "Defendant's own Note History" shows that "the Loan was charged to profit and Loss by SLS on January 26, 2010."  (Dkt. 30 at 11).  But the confirmations sent from SLS to Trans Union also indicate that the loan had been charged-off.  (Dkts. 30-5, 30-6, 30-7, 30-11 at 112 (indicating account status code "13" indicates a paid or closed account)).  And while Phillips appears to have sent Trans Union evidence validating her position, there is no evidence that Trans Union sent this on to SLS.  The inquiries that Trans Union sent to SLS allude to some of this evidence, but are not very specific or consistent.  (*Compare* dkt. 30-5 ("Disputes Date of Last Payment/Date Opened/Date of First Delinquency/Date Closed.  Verify all dates.") *with* dkt. 30-7 ("Claims company will change. Verify all account information.")).  And finally, Phillips offers no evidence about how difficult it would have been for SLS to consult the relevant records.  In short, there is evidence going both ways, and while the evidence may on the balance favor Phillips, the multifactored nature of the reasonableness analysis demonstrates why these questions should go to the jury.

Accordingly, the Court will deny summary judgment on Count 1.

### ii.     Count 2: Willful Violation of the FCRA by SLS

Section 1681n provides liability for willful violations of the FCRA.  A furnisher who willfully violates the furnisher obligations spelled out above is liable for (1) actual damages between $100 and $1,000, (2) punitive damages, and (3) costs and reasonable attorney's fees.  15 U.S.C. § 1681n.  "A showing of malice or evil motive is not required to prove willfulness under the Act."  *Dalton*, 257 F.3d at 418.  Instead, acting with "reckless disregard" of FCRA obligations can be sufficient to prove willfulness.  *See Safeco*, 551 U.S. at 57.  This is a "high standard."  *Berry v. Schulman*, 807 F.3d 600, 605 (4th Cir. 2015).  To succeed, the plaintiff must

"show that the defendant 'knowingly and intentionally committed an act in conscious disregard for the rights' of the consumer." *Dalton*, 257 F.3d at 418. "A defendant may demonstrate reckless disregard of its statutory obligations by repeatedly ignoring warning signs that it is violating the law and by failing to take corrective action to prevent future violations." *Daugherty*, 2017 WL 3172422 at *5.

However, "[w]here states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie." *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). This remains true in the FCRA context: "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind." *Dalton*, 257 F.3d at 418.

Phillips' motion for summary judgment on the willful violation fails. While there may be sufficient evidence for a jury to infer "reckless disregard" on SLS's part, there is insufficient evidence to hold as a matter of law that every reasonable jury must make that inference. *Id.* at 418. The primary evidence put forward to establish willfulness is the repeated nature of SLS's alleged refusal to adequately investigate Phillips' complaint. But as discussed above, Phillips has failed to clear even the lesser hurdle of demonstrating that there is no genuine dispute about the reasonableness of SLS's investigation. And even if it had, reasonable juries could disagree on whether three violations, without other evidence of intention, establish willfulness. *Anderson*, 477 U.S. at 248.

Accordingly, this Court will deny Phillips' motion for summary judgment on Count II.

### IV. CONCLUSION

Based on the foregoing, the Court will deny Phillips' motion as to the negligent violation of the FCRA because there still is a genuine issue of material fact about whether SLS's investigation into the dispute was reasonable. The Court will also deny Phillips' motion as to the

alleged willful violation of the FCRA because Phillips' evidence is insufficient to establish as a matter of law that there is no genuine issue of material fact about SLS's willfulness.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to Plaintiff, Defendants, and all counsel of record.

Entered this ⎯6th⎯ day of September, 2017.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE